371 A.2d 992

**John F. NASH and Robert C. Haldeman, Trustees of the Property of Lehigh Valley Railroad Company, Appellants,**

**v.**

**CHEMETRON CORPORATION.**

Superior Court of Pennsylvania.

Argued June 22, 1976.

Decided March 31, 1977.

---

7. The four witnesses were Mr. Lutz (NT 31), Mrs. Bauchspies (NT 77–8), Mr. Gilds (NT 12) and Mrs. Smith (NT 143).

J. Edgar McDonald, New York City, with him Richard F. Stevens, Allentown, for appellants.

Richard B. Rogers, Carpentersville, with him Raymond J. DeRaymond, Easton, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

■■ This appeal is from the lower court's order granting a motion for summary judgment in favor of appellee Chemetron Corporation. It is well established that a motion for summary judgment may be granted only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Pa.R.C.P. No. 1035(b). The moving party has the burden of proving that a summary judgment is appropriate, *Ammerman v. Lush*, 236 Pa.Super. 231, 345 A.2d 271 (1975), and the record must be examined in a light most favorable to the non-moving party. *Barker v. Brown*, 236 Pa.Super. 75, 340 A.2d 566 (1975). We have determined that there is no genuine issue of material fact in this case and that the lower court properly granted appellee's motion. Therefore, we affirm.

Between July 1, 1968, and July 30, 1973, appellee shipped by rail 269 carloads of phosgene gas from La Porte, Texas, to its plant in Stockertown, Pennsylvania. Phosgene gas is an extremely dangerous poison. It was used during World War I for chemical warfare, and today it has a number of industrial purposes. Due to the dangerous nature of phosgene, the method of transporting it is strictly controlled. *See* 49 C.F.R. § 173.300 *et seq.*

In this case, the phosgene was shipped in one-ton cylinders on specially designed freight cars. The car is ba-

sically an underframe consisting of fifteen cradles. Each cradle is designed to accept one cylinder, and the cylinder is secured to the underframe by a clamp. When the car reaches its destination, the fifteen full cylinders are removed and replaced with fifteen empty ones.

The railroad charges a tariff on each carload of gas shipped. The amount that a railroad may charge is controlled by schedules devised by the Interstate Commerce Commission (ICC). A tariff "embodies an analysis of the costs incurred in the transportation of a certain article and a decision as to how much should, therefore, be charged for the carriage of that article in order to produce a fair and reasonable return." *United States v. Western P. R. Co.*, 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956).

For the 269 shipments by appellee of phosgene gas, the Lehigh Valley Railroad charged a total of approximately $282,191.40. This amount was determined using the "tank car" rate, which is based solely on the net weight of the gas shipped. Subsequently, appellants John F. Nash and Robert C. Haldeman, Trustees of the Lehigh Valley Railroad, determined that the "container" rate should have been charged. Under this theory, appellees should have been billed for the weight of each cylinder in addition to the weight of the gas. A total of approximately 23,100 pounds would thus have been added to the weight of each carload which would have resulted in additional charges totaling $827,051.98. Appellants have sued in assumpsit to recover that amount from appellee.

■■ The issue in dispute may be conceptualized as whether the cylinders are part of the car, and therefore should not be charged to the shipper, or whether the cylinders are containers, regarded as part of the shipper's product. Appellant contends that the lower court erred in failing to defer this question, under the doctrine of primary jurisdiction, to the ICC. In other words, appellants contend that the resolution of the contractual dispute de-

pends on the answer to a question which lies within the peculiar competence of the federal agency, and that the federal agency should have been asked to rule on the question before the lower court could make a decision.

" 'The doctrine of primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' (citation omitted) The doctrine is based on the principle 'that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over,' (citation omitted)." *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 684–85, 85 S.Ct. 1596, 1599, 14 L.Ed.2d 640 (1965).

The lower court found, and neither appellants nor appellee contest, that the question of the applicability of the tank car rate or the container rate to the shipments in question is a matter relegated to the competence of the ICC. However, the lower court held that the doctrine of primary jurisdiction did not require referral in this case because the ICC had already decided the question at issue. "Certainly there would be no need to refer the matter of construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it." *United States v. Western P. R. Co.*, 352 U.S. 59, 69, 77 S.Ct. 161, 168, 1 L.Ed.2d 126 (1956).

The method used to transport phosgene in this case was designed by Mathieson Alkali Works and approved by the ICC in 1921. In *Mathieson Alkali Works v. B. &*

*O. R. R.*, 85 I.C.C. 728 (1923), the defendant railroad broke with tradition and began charging the chemical manufacturer tariffs based on the total weight of the gas and cylinder. A suit for reparation by Mathieson resulted in the ICC holding that "the complainant's multiple-unit tank car with full complement of tanks which form the superstructure of the car securely attached to the underframe when offered for transportation, falls within the undefined designation "tank cars" as used in defendant's classification and tariffs." 85 I.C.C. at 734.

In *Definition of Tank Cars*, 104 I.C.C. 196 (1925), the respondent railroad interpreted *Mathieson Alkali Works, supra,* to mean that the multiple-unit tank car was a "tank car" only if the cylinders were permanently attached to the underframe so that they could not be removed for any purpose. The ICC rejected the proposed definition, holding that the distinction could not be justified.

There is no dispute that the cars discussed in *Mathieson Alkali Works* and *Definition of Tank Cars* were essentially identical in design and use to the cars involved in this case. There is also no contention that the fact that those cases involved the shipment of chlorine gas, whereas the present case involves the shipment of phosgene gas, should have any bearing on the resolution of the case.

Appellants contend that *Mathieson Alkali Works* and *Definition of Tank Cars* may be distinguished by the use to which the cylinders were put after removal from the underframe. In those cases, it is contended, the cylinders reached their destination, were removed from the underframe, and were emptied, after which they were placed on an available underframe for return. In this case, however, the cylinders are removed from the underframe, sent to appellee's customers, emptied, returned to appellee, placed on an available underframe and returned. Appellants contend that the intermediate step of tran-

sporting the cylinders to appellee's customers distinguishes this case from *Mathieson Alkali Works* and *Definition of Tank Cars,* and, therefore, we must refer this case to the ICC.

In support of their contention, appellants cite the concurring opinion of Commissioner Hall in *Definition of Tank Cars:*

> "if [the tanks or cylinders are] removed from the underframe at destination and put to other uses not incidental to delivery it seems to me that the tanks cease to be integral parts of the car. In such case the shipment in reality consists of container as well as contents and the rate should be applied to the aggregate weight of both." 104 I.C.C. at 202.

There are many reasons for rejecting appellants' argument. First, Commissioner Hall's opinion did not reflect the decision of the Commission. Second, appellants admit that in *Definition of Tank Cars,* the ICC assumed that the cylinders were removed for the purpose of emptying, filling, or storage. In this case, the cylinders are removed for the purpose of emptying, albeit not at their immediate destination. Finally in 1971, appellants requested an informal ruling on the issue in question from Joel E. Burns, Chief of the Section of Rates and Informal Cases for the ICC. In reply, Mr. Burns cited *Mathieson Alkali Works* and *Definition of Tank Cars* as directly controlling the issue in this case. Of course, Mr. Burns' informal opinion is not binding on us and is not a decision within the meaning of *United States v. Western P. R. Co., supra.* However, it does lend further support to our conclusion that the question presented here has been decided by the ICC in *Mathieson Alkali Works* and *Definition of Tank Cars.* Therefore, the lower court correctly refused to refer the case to the ICC and properly applied the ICC's decision to the contract dispute in this case.

The order of the lower court is affirmed.

VAN der VOORT, J., dissents.